IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:07-CV-501

| | |
|---|---|
| DR. PHONG NGUYEN, individually and derivatively on behalf of HEALTH PARTNERSHIP, INC., a Colorado Corporation, <br><br> Plaintiff, <br><br> v. <br><br> HEALTH PARTNERSHIP, INC., a Colorado Corporation, LEE WISKOWSKI, GERARD JACOBS, DOUGLAS STUKEL, <br><br> Defendants. | **COMPLAINT** |

Now Comes the Plaintiff, by and through undersigned counsel, and complaining of the Defendants above named, avers and states as follows:

**PARTIES**

1. Plaintiff Dr. Phong Nguyen ("Nguyen") is a citizen of the State of North Carolina and a resident of Wake County.

2. Upon information and belief, Defendant Lee Wiskowski ("Wiskowski") is a citizen and resident of the State of Illinois.

3. Upon information and belief, Defendant Gerard Jacobs (Jacobs) is a citizen and resident of the state of Illinois.

4. Defendant Douglas Stukel (Stukel) is a citizen and resident of the State of Illinois.

5. Upon information and belief, Defendant Health Partnership Inc. (hereinafter "HPI") is a Colorado corporation with its headquarters in Cook County, Illinois.

6. Upon information and belief, at all times relevant to this lawsuit, Defendants Wiskowski, Jacobs and Stukel (collectively "the Individual Defendants") all either individually or beneficially owned stock in HPI or controlled entities which owned stock in HPI. In addition, the Individual Defendants served as the principal officers of HPI and controlled a majority of the board of directors of HPI.

## JURISDICTION

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as Plaintiff alleges causes of action arising under 17 U.S.C. § 101, et seq., as hereafter more fully appears.

8. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1367(a) as to the Plaintiff's remaining causes of action and alternative causes of action arising under the laws of the State of North Carolina.

9. The amount in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C.§1332(a) and the jurisdiction of this Court is invoked on the basis of the diversity of the parties' citizenship.

10. This Court has personal and subject matter jurisdiction in this action and venue is proper in the Eastern District of North Carolina.

## GENERAL ALLEGATIONS

11. On October 18, 2005, Thomas Flynn and Randall Rohm, officers of Capital Partners For Health & Fitness, Inc., a North Carolina Corporation ("Capital Partners") signed a letter of intent to merge their company with HPI. HPI and the individual defendants were also listed as signatories on the letter. See Exhibit A.

12. At this time, Capital Partners owned and/or operated nine health and fitness clubs in North Carolina. Capital Partners was owned and operated by Randall Rohm and Thomas Flynn.

13. Although this requirement was not contained in the letter of intent, the Defendants insisted that Randall Rohm and Capital Partners buy out Rohm's partner, Jeremy James, as a prerequisite of the merger contemplated in the Letter of Intent.

14. In response to the demands made the Defendants, Rohm informed them that the business did not have enough capital to buy out Jeremy James and keep the health and fitness clubs running at a sustainable level during the period between late October and the anticipated funding promised in the Letter of Intent.

15. It was critical for Capital Partners' health club business to retain adequate funds during this time period to invest in advertising, maintenance, and upgrades to its facilities. As stated by Defendants in the Form 10-KSP for the Fiscal Year Ended December 31, 2005,

> Our success will be tied in large part to its ability to continue to attract and retain new members . . . the health club industry experiences significant turn over in memberships due to a variety of reasons . . . Consequently, we believe we must attract and retain a large number of paying members on an ongoing basis. To do so, we must continue to invest significant resources in order to enhance its existing facilities, equipment and services, and to introduce new high-quality facilities, equipment and services.

Exhibit B. This need for funds was especially critical in order to advertise at the beginning of the year, the time when the health clubs have historically signed up the most members.

16. In order to induce Rohm to buy out Jeremy James and, Defendants promised Interim or "Bridge Loan" financing to Rohm to be paid in or around December, 2005 in order to keep the business adequately capitalized. The Individual Defendants personally and on behalf of

HPI represented to Randall Rohm and/or Thomas Flynn that Bridge Loan financing would be provided for Capital Partners of up to $1,000,000. The Individual Defendants, individually and on behalf of Defendant HPI, made numerous private and public written and oral statements, including a press release, concerning the bridge financing to cover the loss of the funds taken from the business to pay off Jeremy James.

17. Pursuant to Defendants' instructions, and relying on Defendants' promises to provide bridge financing to cover the shortfall, Rohm entered into an agreement buying out Jeremy James with funds the corporation was not able to use to provide adequate cash flow for the health club operation. In addition, Rohm obtained loans from third parties to be paid from the bridge financing.

18. On or around November 28, 2005, Plaintiff loaned $275,000 for use by Capital Partners in exchange for a promissory note and some of Mr. Rohm's future stock in HPI. Plaintiff loaned this money in reliance on Defendants' numerous public and private statements to Rohm that the bridge financing would be immediately forthcoming. Upon information and belief, Defendants knew that Mr. Rohm was borrowing money in order to raise funds to buy out Jeremy James from third parties in anticipation of the bridge loan financing. Further, upon information and belief, Defendants knew that Mr. Rohm borrowed money from Plaintiff specifically in anticipation of the bridge loan financing.

19. As a result of the November 28, 2005 transaction, plaintiff obtained contractual rights to 137,500 of shares of stock in HPI from Randall Rohm. Plaintiff later obtained additional shares of HPI.

20. At no time relevant to this action did Defendants ever provide interim financing to fund the health club operations of Capital Partners and to provide funds to help buy out Jeremy

James.

21. Notwithstanding the fact that no such interim financing was ever provided, Defendants made numerous statements concerning this financing in the February 13, 2006 agreement and in various press release and filings submitted to the Securities and Exchange Commission, see, e.g., Exhibits C, D, and E. Subsequent to December, 2005, Defendants repeatedly claimed in SEC filings that the interim financing had been provided when, in fact, it had not. For example, in the HPI Annual Report on Form10-KSB, the Defendants stated as follows:

> In December, 2005, Douglas J. Stukel and two other individuals loaned an aggregate of $300,000 to us ($100,000 by Mr. Stukel), which was supplemented by an additional $100,000 loan on January 30, 2006, which in turn was loaned by us to Capital Partners at 8% per annum to enable Capital Partners' shareholders to effect the funding of the buyout of a former minority shareholder of its predecessor entity and, to enable it to fund certain of its working capital requirements.

Exhibit B. This statement was false insofar as no funds were ever disbursed to Capital Partners in December 2005 or at any time relevant to this action.

22. As a result of HPI's failure to provide interim financing, the health club operations of Capital Partners were immediately impacted. Capital Partners was not able to maintain adequate advertising and maintenance of its clubs. Because of this, club sales rapidly began deteriorating during this time period. At all relevant times, Defendants knew of the necessity to provide interim financing in order to maintain adequate advertising and maintenance of the clubs and the adverse consequences for the business which would and did result from their failure to provide the bridge loan.

23. On February 13, 2006, HPI entered into an Agreement and Plan of merger with Capital Partners for Health & Fitness, Inc., a North Carolina corporation, (the aforementioned

"Capital Partners"), Capital Partners Merger Sub, Inc. a North Carolina corporation and wholly-owned subsidiary of the Company (hereinafter "Mergeco"), Capital Partners Acquisition Sub, Inc., a North Carolina corporation and wholly-owned subsidiary of the Company ("Acquisitionco"), Randall Rohm and Thomas Flynn. <u>See</u> Exhibit D (February 13, 2006 Merger Agreement).

24. Prior to this merger, HPI had been a shell corporation under the control of the individual defendants, Jacobs, Stukel, and Wiskowski (collectively "the individual defendants").

25. Pursuant to the terms of the February 13, 2006 Merger Agreement, Mergeco merged with Capital Partners, with Capital Partners continuing to exist as the surviving corporation following this merger. Immediately thereafter, Capital Partners merged with Acquisitionco, which remains a wholly-owned subsidiary of HPI. Immediately following the Merger, Acquisitionco filed the necessary documents with the North Carolina Secretary of State to change its name to Capital Partners For Health & Fitness, Inc.

26. As a result of the merger, HPI became a holding company and its shell company status terminated.

27. In the February 13, 2006 agreement, HPI, controlled by the Individual Defendants, contracted to provide "Bridge Loan" or interim financing for Capital Partners and falsely represented that the loan already had an outstanding principal balance as of the date thereof of $400,000, plus accrued interest at the rate of 8% per annum. The February 13, 2006 agreement was filed as an attachment to a Form 8K with the SEC.

28. The February 13, 2006 Merger Agreement calls for $6,992,589 in Cash Consideration and 3,496,430 shares of HPI stock plus an additional Contingent Earnout Consideration to Randall Rohm and Thomas Flynn. The Cash Consideration was to be reduced,

dollar by dollar, by among other items, the balance of the Bridge Loan.

29. Despite the above referenced statements in the February 13, 2006 agreement, HPI failed to provide any funding to Rohm, Flynn, or the business operations of Capital Partners as called for in that agreement.

30. Upon information and belief, the Individual Defendants caused HPI to enter into the February 13, 2006 Agreement with the intent and knowledge that HPI would not fulfill its funding obligations under the February 13, 2006 Agreement.

31. On April 4, 2006, the Individual Defendants caused HPI to file a Form 8K with the Securities and Exchange Commission concerning an additional $300,000 being lent to HPI by Defendant Stukel. The exhibit attached to this statement falsely states that $400,000 in bridge loan financing had been provided to the operations of the company.

32. On April 17, 2006, the Individual Defendants caused HPI to file a Form 10KSB with the Securities and Exchange Commission. Exhibit B. This document is quoted in paragraph 21, *supra,* as falsely representing that $400,000 had been loaned to the operations of the health clubs. On May 4, 2006, the Individual Defendants caused HPI to file an amendment to the April 17, 2006 Form 10KSB which retained this false representation verbatim.

33. On June 28, 2006, a Modification Agreement was signed by and among Randall Rohm, Capital Partners, and HPI. See Exhibit F. The June 28, 2006 Modification Agreement slashes the Cash Consideration to Randall Rohm and Thomas Flynn to an aggregate of $1,600,000, ($95,000 for Flynn and $1,505,000 for Rohm) purportedly for the purpose of enabling HPI to procure Interim Financing in an effort to stabilize the health club operations. It also modified the Earn-Out Contingent and terminates the employment agreement of Rohm. The June 28, 2006 agreement falsely stated that $692,000 in interim financing had been provided,

even though no bridge loan funds were ever disbursed to Rohm, Flynn, or the health clubs.

34. Notwithstanding the statements and representations made prior to and including the February 13, 2006 agreement and the June 28, 2006 Modification Agreement, defendants continued to fail to provide the promised consideration in these documents to Randall Rohm and Thomas Flynn and continued to fail to provide any Interim Financing to help stabilize the failing health clubs. According to the June 28, 2006 Modification Agreement, the health clubs owed approximately $530,000 in past due payables and rent by that time.

35. On March 1, 2007, the Individual Defendants caused HPI to deregister as a publicly reported company due, among other things, to an inability to maintain on a current basis its audited financial statement and other reporting requirements with the SEC.

36. On May 4, 2007, a new modification agreement was signed by HPI and Rohm. See Exhibit G. This agreement reduced the Cash Payment from Rohm from $1.600,000 to $1,184,600.23 and allows Rohm to sell back stock to HPI for $16,399.77, giving Rohm a total payment of $1,200,000. Upon information and belief, Rohm was placed into a weakened and compromised position by Defendants' earlier failure to provide the funding promised, and signed this agreement out of desperation to salvage what he could from the damage Defendants did to a previously viable and ongoing business worth over $8,000,000. Upon information and belief, the Individual Defendants threatened Rohm that if he did not sign the May 4, 2007 Agreement and further reduce his payout, that the Defendants would breach their prior agreements.

37. Upon information and belief, on August 23, 2007, the Individual Defendants, controlling more than 50% of the stock of HPI, voted to 1) sell all of its health club assets for assumption of its $1,300,000 in debt; 2) cease its health club activities and focus on the acquisition of another operating business; 3) change the name of the corporation to a new name

to be selected in the discretion of the Board of Directors, 4) approve a pro rata reverse split of the common stock, and 5) to authorize increasing the board size from three to up to seven members.

38. As a result of Defendants' failure to fund the bridge loan and the resulting damage to the health club assets of HPI, as well as defendants' other actions, the value of plaintiffs' stock in HPI has plummeted.

39. As a result of Defendants' failure to fund the bridge loan and other actions, Rohm was unable to repay the $275,000 to Plaintiff.

### FIRST CAUSE OF ACTION: FRAUD

40. Plaintiff incorporates by reference the allegations in paragraph one through thirty nine.

41. Defendants made numerous false representations of material fact when they stated to Randall Rohm and to the public in various press releases and filings with the SEC that interim financing would be provided and money for such financing had been or soon would be raised. Upon information and belief, these false representations were made with the intent or reason to expect that their terms and substance would be repeated or communicated to third persons and would influence their conduct, i.e., induce them to loan money in the interim.

42. Upon information and belief, Defendants concealed material facts concerning the true nature of their ability to raise interim financing and the state of their attempts, if any, to provide the financing they promised.

43. Defendants' false representations and concealments were calculated to deceive.

44. Defendants' false representations were made and concealments were done with intent to deceive.

45. Plaintiff was, in fact, deceived by the false representations and concealments of

the Defendants and relied on them to his detriment.

46. Plaintiff's reliance on the false representations and concealments of the Defendants was reasonable.

47. Plaintiff suffered damages as a result of his reliance on the Defendants' false representations and concealments.

## SECOND CAUSE OF ACTION: FEDERAL SECURITIES FRAUD

48. The allegations in paragraph one through forty seven are hereby incorporated by reference.

49. As alleged above, the Individual Defendants, individually and in their capacity as officers, directors, and controlling shareholders of HPI, made numerous public and private false statements and omissions of material fact concerning the implementation of interim financing.

50. Upon information and belief, Defendants knew or should have known that these statements were false. The interim financing was never provided as stated. The Defendants, knowing that the interim financing had not provided, nevertheless made public false statements in SEC filings that such financing was provided.

51. Plaintiff justifiably relied on these statements to his detriment.

52. Plaintiff's reliance on the representations of defendants caused him damage.

## THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

53. The allegations in paragraph one through fifty two are hereby incorporated by reference.

54. As directors and officers of HPI, the individual defendants owed and owe fiduciary duties of care and loyalty to HPI and its minority shareholders.

55. The individual defendants breached their fiduciary duties of care and loyalty to

HPI by:

    a.    Failing to take appropriate steps to ensure that HPI followed the terms and conditions of the February 13, 2006 Merger Agreement and the June 28, 2007 Modification to the Merger Agreement;

    b.    Failing to ensure that interim financing was provided to fund the operations of HPI;

    c.    Diverting sums intended to provide the interim financing to fund the operations of HPI to unknown and undisclosed recipients;

    d.    Failing to protect the assets of HPI by purportedly issuing promissory notes for funds allegedly raised for the interim financing and failing to ensure that the interim financing proceeds were used for their intended purpose;

    e.    Making false statements and representations concerning the interim financing, including but not limited to false statements to the Securities and Exchange Commission;

    f.    Failing to take any steps to preserve the health club business of HPI;

    g.    Failing to act in good faith in the best interests of HPI in their roles as officers and directors thereof;

    h.    Failing to exercise reasonable care in making business decisions on behalf of HPI; and

    i.    Other acts and omissions.

56.    As a direct and proximate result of the breaches of their fiduciary duties by the individual defendants, HPI has been damaged and the value of Plaintiff's stock in HPI has been diminished.

57. Plaintiff has not made any demand upon the management or board of directors of HPI because such demand would be futile inasmuch as the individual defendants at all relevant times constituted the majority of the ownership, the majority of the directors and the senior level officers of HPI.

**FOURTH CAUSE OF ACTION: UNFAIR AND DECEPTIVE TRADE PRACTICES**

58. The allegations in paragraph one through fifty seven are incorporated by reference.

59. The actions of the individual Defendants were in or affecting commerce within the meaning of Chapter 75 of the North Carolina General Statutes.

60. The Defendants committed unfair or deceptive trade practices by:

    a. Failing to take appropriate steps to ensure that HPI followed the terms and conditions of the February 13, 2006 Merger Agreement and the June 28, 2007 Modification to the Merger Agreement;

    b. Improperly diverting funds belonging to HPI which were intended to constitute funds for operating the health club operations of Capital Partners for their own use and benefit.

    c. Breaching their fiduciary duties; and;

    d. Other acts.

61. The acts of the Defendants as alleged <u>supra</u> constitute unfair or deceptive trade practices within the meaning of N.C. Gen. Stat. § 75-1.1.

62. As a direct and proximate consequence of the unfair or deceptive trade practices of the Defendants, plaintiff has suffered damages. Damages should be trebled pursuant to N.C. Gen. Stat. § 75-16 and plaintiffs' attorney's fees and costs of litigation are recoverable pursuant

to N.C. Gen. Stat. § 75-16.1.

## FIFTH CAUSE OF ACTION: CONSPIRACY

63. The allegations of paragraphs one through sixty two above are hereby incorporated by reference and realleged as if fully set forth herein.

64. Upon information and belief, the individual defendants agreed with each other to do one or more unlawful acts, including but not limited to the acts alleged above.

65. Any one or more of the individual defendants as parties to the agreement committed an overt act in furtherance of the aims of the agreement.

66. As a direct and proximate result of the acts committed in furtherance of the aims of the agreement, plaintiff suffered damages.

67. As a result of this conspiracy, the conspiring Defendants are all jointly and severally liable under all the previous causes of action alleged in this complaint.

## SIXTH CAUSE OF ACTION: PUNITIVE DAMAGES

68. The allegations of paragraphs one through sixty seven are hereby incorporated by reference and realleged as if fully set forth herein.

69. The conduct of the Defendants involved fraud, malice, and willful or wanton conduct.

70. The Defendants' tortious conduct resulted in actual damages to Plaintiff.

71. Pursuant to N.C. Gen. Stat. § 1D-1, punitive damages are appropriate in this case in order to punish the Defendants for egregiously wrongful acts and to deter them and others from committing similar wrongful acts.

72. Pursuant to N.C. Gen. Stat. § 1D-1-25, each defendant is individually liable to the Plaintiff for punitive damages not to exceed $250,000 or three times actual damages, whichever

is greater.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that a jury trial be held as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff having fully complained of the Defendants respectfully prays the Court for the following relief:

1. Entry of judgment in favor of the Plaintiff whereby the Plaintiff shall have and recover of Defendants jointly and severally actual damages in the amount of Two Hundred Seventy-five Thousand Dollars ($275,000.00) as a direct and proximate consequence of the Defendants' fraud, securities fraud, breach of fiduciary duty, and unfair and deceptive trade practices breach of fiduciary duties, and fraud;

2. The trebling of actual damages awarded to the Plaintiff pursuant to N.C. Gen. Stat. § 75-16;

3. In the alternative, an award of punitive damages against the each of the Defendants for their willful misrepresentations and concealment of material facts in breach of their fiduciary duties in an amount allowed by law;

4. An award of reasonable attorney's fees pursuant to N.C. Gen. Stat. § 75-16.1;

5. The taxing of all costs of this action to the Defendants; and

6. Such other and further relief as the Court may deem just and proper.

This the 27th day of December, 2007.

                STARK LAW GROUP, PLLC

By:   \s\ Thomas H. Stark

       Thomas H. Stark, NCSB No. 10052
       Seth H. Neyhart, NCSB No. 27673
       Attorneys for Plaintiff
       6011 Farrington Road, Suite 300
       Chapel Hill, NC 27517
       Telephone:   (919) 490-5550
       Facsimile:    (919) 490-5551

## VERIFICATION

The undersigned, Dr. Phong Nguyen, after being duly sworn, deposes and says that he is the plaintiff in the above-captioned matter, that he has read the foregoing Complaint and the matters alleged therein are true to the best of his personal knowledge except as to those matters stated upon information and belief and as to those matters he believes them to be true.

_____
Dr. Phong Nguyen

Sworn to and Subscribed Before Me

This the 27th day of December, 2007.

_____
Notary Public of the State of North Carolina
Durham County
My Commission Expires: 7-26-2010

*[Notary Seal: Diana Evans, Notary Public, Wake County, NC, Comm. Exp. 7-26-2010]*